The next case is Adar Bays v. GeneSYS. Good morning, Your Honors. My name is Jonathan Uretsky, and I represent GeneSYS ID, the defendant-appellant in this matter. I'd like to begin this morning with the text of 19040. I don't believe this can be overstated. It contains the term, quote, or other property. A person is guilty under 19040 of criminal usury in the second degree when not being authorized or permitted by law to do so. He knowingly charges, takes, or receives, and this is the critical part, any money or other property as interest on the loan. And it continues. I'm assuming you have familiarity at this stage with the text. The point is my adversary, the court below, and many other courts in the districts below seem to take a position that writes out those words from this statute. If property is something different than money, then there must be a way to value that Is that amount over the interest rate of 25, or is that amount lower than 25 percent? Now, in order to do that, this case, it's actually pretty easy. What you need to do is distinguish between the — I guess there's three different components. There's the principal. In this case, that was 35. We only got 33, but $35,000. So there's the principal component. Second, there's what's known as the discount component. And then third, there's the lookback. Now, I think the tricky part and the problem that's caused the line of cap — the line of cases and the progeny of union capital is that there's too much focus on the lookback. Now, if you pretend the lookback doesn't matter at all, that's the portion where you look back over the past 20 days, you see what the lowest price was, pretend that doesn't exist. In this case, and in just about all the others before Your Honors right now, with that discount over the principal, it's always over 25 percent. Let's look what happens here. In this particular case, the math is very simple. It's a $5,000 debt conversion that's at issue here, and that's why I'm going to use that. But it works whether I was going to convert $1 or $10 or the entire $35,000. Basically, the way the math works is every single time $5,000 equals $7,692, I think, in 30 cents. But the point is $5,000 that you want to convert, that's how much debt goes away from the $35,000 loan, from $35 down to $30, that turns into stock of $7,692. Let me walk you through an example if it's $1. If the trading is $1, if that's what happens to be trading at that day, then, because the math is easy, $1 equals $7,692 shares. Let me ask you this. If I borrowed money, or if I'd lent money, standard note, payable in a year, and as part of the transaction, I took back a warrant. So I gave myself the option to either get my cash back or exercise the warrant and get some whatever number shares from you instead of the cash. And when I exercised the warrant, I decided to exercise the warrant and I got more than 28%. Would that be a usurious transaction? I wouldn't know without more information. What more information? What you're talking about is what happened later. You're talking about the price. I'm just asking a hypothetical. Right. Now, what in your hypothetical, was there also a fixed discount in addition to what you're talking about? If you're talking about no, but using only the facts that you supplied, no, it's not usurious because it's an option relating to the future. And that gets to, effectively, the lookback, because the lookback portion, which I said we can ignore in all of these cases and certainly in this one, that's irrelevant because it's always more than my 7,692. So in your example, effectively, what would happen is the 5,000, so we start at 35,000, it goes down to 30 because we're discharging that debt. We're now at 30,000. That 5,000 turns into minimally, and that's the key, minimally $7,692 every time. Now, in your example, it would actually be more on top of that. Let me give you some more facts. So in my hypothetical, the stock's selling for 10 bucks a share. Okay. And then I get a warrant to purchase 500 shares. Okay. When I exercise the warrant, I make in excess of 28 percent. Mm-hmm. Is that okay? Yes, it is. Because? Well, because that's not this situation. It's not fixed. It is based on the future. It's a warrant or an option, which looks at the future. That's completely different from here, where we have a fixed discount. So the discount is what makes this something that can properly be considered as interest? Because otherwise, it's the exact same transaction, right? Your client is not actually paying any money out. There's an equity transaction that you are now trying to say is part of the original loan and can be valued in the interest calculation. Yes. What I'm saying is when you break it down into the three components, principal is principal. We have a small fight over the $2,000 for the attorney's fees there, but principal is principal. Then there's over and above whatever I'm arguing here. There's the look-back, which, yes, in the future, that can be a whole lot of profits, and frankly, that doesn't matter. But then there's the guaranteed discount, the way $5,000 always constantly turns into 7692. If it's trading at $1, you get 7692 shares. If it's trading at 80 cents, you're looking at 9,615 shares. If, as in this case, it's only trading at 0.0175 cents, then you get 439,560 shares. But each of those examples is equal to $7,692. It's a constant value. Then it becomes really simple. Is that $7,692, as compared with $5,000, is that more than 25 percent? And the answer is yes. It's math. And then the only question, and really that's the issue before your court, before this Court, is, is it somehow too uncertain to call that interest? And you're looking to just avoid this obligation altogether, right? Keep the money? Yes. Was your client counseled when this transaction was affected? I was not involved in that. I came on later, but my understanding is yes. Thank you. Good morning, Your Honors. May it please the Court. My name is Kevin Curlie of the firm Garson Siegel Steinmetz Fladgate, on behalf of Appelli at our base. I ask the Court to put an end to this campaign by an affiliated group of attorneys and corporations seeking to achieve total windfalls from obligations willingly and knowingly entered into. Before addressing counsel's specific points, I think it's important to convey two underlying issues that should be kept in mind when considering why the lower court and numerous other courts rejected these arguments over and over again. The first relates to the policy considerations behind New York's usury laws. We know the policy and we know why the usury laws were created, namely to prevent taking advantage of the poor, the desperate, the needy. The archetypal scenario is the head of a household recently laid off, taking a loan at an exorbitant rate, just trying to put food on his or her family's table. We get all of that, but the issue I'm wrestling with is why don't the terms of the statute cover this transaction? The terms of which statute? The statute that Mr. ---- that your opponent just discussed with us. Okay. So going back to the policy, I think there are essentially four tiers. Let's get to the policy later. Let's do the text first. Okay. So there are three relevant parts of the New York General Obligation Law, Section 5.511 and 5.500. 5.501 is what prescribes loans in excess of 16 percent to individuals only. Also in that section are two carve-outs, creating maximum loan amounts. One is of two ---- The law is arguing that this is a personal loan. Let's get to the corporate. Okay. The Section 5.511 voids loans prohibited in 5.501. It states that specifically. Section 5.521 prohibits corporations from interposing the defense of usury as defined in Sections 5.500, 5.511, and 5.521, and sends corporations outside of that statutory framework entirely into the criminal framework, to Section 19040. Every time in Section 5.501, 5.511, and 5.521, every time that the legislature wanted to include or exclude the criminal usury statute, Section 19040, it did so. Importantly and very tellingly, in 5.511, which voids 5.501, it makes no mention of Section 19040. That can't be disregarded. That was intentional. So to go back to my tiers of protection, we have individuals at 16 percent. Those are void. That's Tier 1. They're the most vulnerable people. They're who the usury laws were meant to protect. Tier 2 are corporations. They're sent to 19040. There's no mention of voiding this statute. It's 25 percent. They're considered less vulnerable than the individual getting loan sharked on the street just trying to put food on the table. Tier 3 presumes more sophistication. When an individual is accepting a loan in excess of $250,000, the legislature presumed that they were counseled or that they have a degree of sophistication where they're not subject to this predatory lending. And then Tier 4 are corporations, the most sophisticated. They're presumed, if they're taking a loan of $2.5 million or more, that they don't need any protection. There's no usury defense for them. Speaking of the sophistication of the party, the Court asked appellant whether the corporation was counseled at the time of this transaction. This is very important. At the time of the issuance of this note, the corporation had six directors all on six-figure salaries. One of those directors was the chief strategy officer. After five months in charge when this — during which this note was issued, that individual became the general counsel of the corporation. I'm sorry. If — if you could maybe go back to the point that Judge Parker was raising. I mean, I — I get you're sort of trying to paint a picture that behind the scenes this is all nefarious, and maybe it is. I don't know. But I think the question I'm interested in is, go back to 19 — 190.40. Could you go back to that, the criminal usury, and just tell us whether or not you consider this mechanism to fall within the category of property that is, you know, property as interest on a loan. Could you just deal with that textual phrase? Sure. Counsel put emphasis on or other property. That property must be exchanged. I think — I think we can all agree on that. At the time of contracting, when a usury determination is to be made, there's nothing exchanged except appellee's money going to appellant. Now, sure, interest is never given back immediately, but what district courts have struggled with is the uncertainty of whether this 35 percent discount — we could I have examples that show that it is not. But whether this 35 percent discount would ever be realized, would ever be exercised — and it's outside of the control of appellant, outside of the control of appellee. It's subject to the market. It's subject to SEC regulation. It's subject to fluctuations in volume and stock price. The corporation could get delisted. It's just too uncertain. What's uncertain about this provision? He can exercise the — he can purchase the stock at a — at the 35 percent discount in accordance with the terms of the loan agreement. There are several things. If appellant becomes delisted, they can't convert. There will be no stock to exchange. If — if the stock price is trending downward, there's no 35 percent discount because the appellant has three days to deliver the stock. While it may be valued at one point at the section — at the moment it's converted at a 35 percent discount, within the 30-day window of this transaction, the stock fluctuated over 300 percent in those 30 days, and on a single day, over 40 percent downward. So that — any discount can — can disappear in a matter of hours, and especially in this market of penny stocks, where these — these stocks fluctuate greatly. Some other examples of uncertainty that the district courts have mentioned, whether plaintiff or appellee would — would exercise the right, whether it could, I mentioned, because of the status with SEC and FINRA, fluctuations in volume, there could simply be no demand for the stock. So there's no realization of that 35 percent discount. There's no property exchanged pursuant to 19040. The corporation could simply run out of shares. Actually, in a — in a case where Mr. Uretsky is also my adversary, that's what happened. The corporation could fire their transfer agent. That's what happened here. There's no way to say that this is guaranteed, either the discount itself or the realization of profits from that discount. Kennedy. And how do you tie that into the statute? I understand that there are contingencies, but why — why does the statute not — well, why isn't it sufficiently flexible to — to contemplate contingencies? Because if no property is exchanged, there's no impermissible 25 percent rate. I think another issue with this 35 percent — And it's your position the property has to be exchanged when, at the time the line closes or when the option is exercised? Well, at the time the option is exercised, that's a different track of argument. At the time the contract closes — It's your position that it has — that something has to happen at the time the line — the loan closes. Correct. What? Property needs to be exchanged. Not merely the potential for property to be exchanged in the future, which may or may not be exchanged. It's too speculative, and that's what the district courts have found time and time again. But — So if there were a warrant or an option that was part of this loan package, it would be not covered? Correct. And the fact that this is a discounted — in essence, a discounted warrant, a warrant with a provision for a discount doesn't change that situation. It's still too speculative, still — still not part of the face — the interest on the face of the document at the time the loan is made. That's correct, Your Honor. I also think there is a valuation issue with that 35 percent. What is the highest court in New York that has addressed this transaction? This transaction, I would say the court of appeals in — in Seidel v. 18 West 17th Street, while it wasn't this transaction, they did acknowledge that such a conversion could transform a loan into an equity investment in certain circumstances. In Seidel, they found that it did not. Using Seidel, only the — the King Supreme Court has addressed a note like this squarely, and then it's been at the district court level as well. Now, as you know, we have — this is, I think, the third case that's now pending before this circuit raising these issues. Is there a benefit to having the New York court of appeals address some or all of the issues in a case like this? I don't see a benefit, Your Honor. I think this court is more than capable with the case law that's out there to either predict or — or create an amalgamation of — or bring together several decisions to — to come to the right outcome. There are several motions to certify that have been out there. One in the LG Capital matter against Cardiogenics was denied yesterday. So I'm not sure — and it was not renewed in this matter, if — if I recall correctly. So I think there's only one motion to certify outstanding, and that would be Blue City. But Cardinal and Blue City have kind of tracked together in terms of — of what they're doing. I believe they share a panel member. Would there be any harm to any of the parties in this case if we were to certify any or all of the questions? One — one harm would be just the delay. These — this group of affiliated attorneys, as I'll call them, has wreaked havoc on — on this industry, and corporations left and right are using this — this same argument that's been rejected time and time again to just walk away from their obligations. They think they don't owe any money back. They're taking loans, and then when — when it suits them, they either fire their transfer agent, they ignore their — they ignore their obligations completely. So I would say that just the prejudice is — is the delay that that would cause, particularly when this Court is perfectly capable of handling those questions. Was this a — was the — was the transaction we're looking at here a loan or an equity investment or both? It begins as a loan. It is money in exchange for an 8 percent return to be paid on the maturity date. The — the district court and a few courts in New York have analyzed this and said at the point of conversion, it becomes an equity investment. Which would not be covered by the statute. Correct. Unless Your Honors have any further — So — so that means the particular circumstances of each exercise have to be considered by a court in determining whether the transaction is usurpice. I would disagree with Your Honor on that point, because the calculus for interest in a usury determination must be made at the time of contracting, what you can see from the four corners of the documents. So taking — so — At the time of the contract, we have no idea whether this option of purchase will ever be exercised. Correct. It can't be exercised for the first 180 days, right? That's also correct. Unless there are any further questions, thank you all for your time. If I may pick up on some of the points that were just addressed. It's not an equity investment. I know that's what the lower court said. It's that it's already been paid. It starts out as a loan, and then it gets converted to stock as payment. That's it. The payment has already occurred. There's no continuation. If I choose to pay you and — I don't follow you. What payment has already occurred? It's the payment for the loan. If we have a loan, you loan me $100. Right. And then pursuant to that loan, you have the right to, instead of having $100 given back to you, you would like property, a stick of gum. It's an overpriced stick of gum, but bear with me. I then give you the stick of gum. I don't owe you the $100 anymore. You elected to get the stick of gum. You don't then have the right to say, well, I might actually hold on to that stick of gum and sell it to someone else next week for, you know, a whole lot less than $100. And therefore, if I — maybe in the future I sell that stick of gum for only $1, that's not fair because of the 99 that I'm not going to get. And that's what we just heard. So many speculative things that could happen. Those are all called possible breaches of contract. So like the lower court below, and like all those cases below, what you hear is there may be a refusal at the transfer agent level. There may be a bankruptcy. There may be noncompliance with securities. Sotomayor, at the time of the closing, I'm giving — I'm getting a warrant. And the stock is selling at $10, and the warrant is to purchase shares at — at some future date at $12. And so at closing, it's not worth anything. But later, it does, and it's over 28 percent. Is it covered? Is it covered by this? No. That's an entirely separate line of cases. That's — what I'm talking about is the look-back, and that's, frankly, irrelevant to the question of whether or not the discount here, which always means that my $5,000 turns into $7,600. You're talking about a warrant, and that's the flow line of cases. I'm talking about the union capital and its progeny, and they got it wrong. You — there's so many different cases. You can look at Collins v. Commissioner. It's at the time of receipt. You can look at the — I can't pronounce this — Gunn-Munson v. United States case. In New York itself, you can look at the Chelten court case. Every single time, you look and you value it at the time of the actual contract. What we're talking about, what you just talked about with my adversary, those are potential breaches. In every single contract, there's always a potential breach. If you hire my law firm, I could commit malpractice. If you have an employment contract, maybe you don't get paid. Maybe you don't do your job. Every contract imaginable has potential for breach. That doesn't affect value, and it certainly doesn't affect our ability in here to constantly see 5,000 equals 7,600, no matter how many shares are needed to get to 7,600. And if you get to 7,600, there's no way to do it without going above 25 percent. The question for you is whether or not that's interest. If the Court has no further questions. Roberts. Interesting case. Thank you. Yeah. Yep. Thank you both. Nicely done. We'll take it under advisement.